# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

| | | |
|---|---|---|
| CRAIG JOSEPH HINDE, | ‖ | |
| Claimant, | ‖ | No. 18-CV-2052-LTS |
| vs. | ‖ | |
| ANDREW M. SAUL, | ‖ | **REPORT AND RECOMMENDATION** |
| Commissioner of Social Security,[1] | ‖ | |
| Defendant. | ‖ | |

---

Plaintiff Craig Joseph Hinde ("Claimant") seeks judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") denying his application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. Sections 401-34. Claimant contends that the Administrative Law Judge ("ALJ") erred in determining that he was not disabled. For the reasons that follow, I recommend that the District Court **affirm in part and reverse and remand in part** the Commissioner's decision.

## I.    BACKGROUND

I adopt the facts set forth in the Parties' Joint Statement of Facts (Doc. 10) and only summarize the pertinent facts here. This is an appeal from a denial of disability insurance benefits ("DIB"). Claimant was born on June 1, 1956. (AR[2] at 172.) Claimant

---

[1] After this case was filed, a new Commissioner of Social Security was confirmed. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul is substituted for Acting Commissioner Nancy A. Berryhill as the defendant in this suit.

[2] "AR" cites refer to pages in the Administrative Record.

is a high school graduate and attended truck driving school. (*Id.* at 206.) He allegedly became disabled due to neuropathy, sleep apnea, high blood pressure, inactive thyroid, high cholesterol, and borderline diabetes. (*Id.* at 205.) Claimant's alleged onset of disability date was January 16, 2015. (*Id.* at 202.) Claimant filed an application for DIB on July 22, 2015. (*Id.* at 172.) Claimant's claim was denied originally and on reconsideration. (*Id.* at 89-92, 97-100.) A video hearing was held on August 9, 2017 with Claimant and his attorney, Hugh Field, in Waterloo, Iowa and ALJ Henry Hamilton and vocational expert Jeff Johnson in West Des Moines, Iowa. Hearing reporter, Ann Sindent was also present, although the record does not indicate at which location she attended. (*Id.* at 41-66.) Claimant and the VE testified. (*Id.* at 43-66.) The ALJ issued an unfavorable decision on November 7, 2017. (*Id.* at 27-35.)

Claimant requested review and submitted a January 29, 2018 order from the District Court for Fayette County, Iowa and March 1, 2018 medical records from Northeast Iowa Mental Health Center as additional evidence. (*Id.* at 2.) The Appeals Council declined to consider this evidence because it was not relevant to the ALJ's November 7, 2017 decision. (*Id.*) Based on the information before the ALJ, the Appeals Council denied review of the ALJ's decision on May 31, 2018. (*Id.* at 1-5.) Accordingly, the ALJ's decision stands as the final administrative ruling in the matter and became the final decision of the Commissioner. *See* 20 C.F.R. § 416.1481 (2019).

On August 1, 2018, Claimant timely filed his complaint in this Court. (Doc. 1.) The case was originally assigned to Chief United States District Court Judge Leonard T. Strand and then-Chief Magistrate Judge C.J. Williams. The case was reassigned from Judge Williams to me on September 17, 2018. All briefs were filed by April 16, 2019. On April 17, 2019, the Honorable Leonard T. Strand referred the case to me for a Report and Recommendation.

## II.    DISABILITY DETERMINATIONS AND THE BURDEN OF PROOF

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant has a disability when, due to physical or mental impairments, the claimant

> is not only unable to do [the claimant's] previous work but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). A claimant is not disabled if the claimant is able to do work that exists in the national economy but is unemployed due to an inability to find work, lack of options in the local area, technological changes in a particular industry, economic downturns, employer hiring practices, or other factors. 20 C.F.R. § 404.1566(c).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows the five-step sequential evaluation process outlined in the regulations. *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). At steps one through four, the claimant has the burden to prove he or she is disabled; at step five, the burden shifts to the Commissioner to prove there are jobs available in the national economy. *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).

At step one, the ALJ will consider whether a claimant is engaged in "substantial gainful activity." *Id.* If so, the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i). "Substantial activity is significant physical or mental work that is done on a full- or part-time basis. Gainful activity is simply work that is done for compensation." *Dukes v.*

3

*Barnhart*, 436 F.3d 923, 927 (8th Cir. 2006) (citing *Comstock v. Chater*, 91 F.3d 1143, 1145 (8th Cir. 1996); 20 C.F.R. § 416.972(a),(b)).

If the claimant is not engaged in substantial gainful activity, at step two, the ALJ decides if the claimant's impairments are severe. 20 C.F.R. § 416.920(a)(4)(ii). If the impairments are not severe, then the claimant is not disabled. *Id.* An impairment is not severe if it does not significantly limit a claimant's "physical or mental ability to do basic work activities." *Id.* § 416.920(c). The ability to do basic work activities means the ability and aptitude necessary to perform most jobs. *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987) (quoting 20 C.F.R. §§ 404.1521(b), 416.921(b)). These include

> (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.

*Id.* (quotation omitted) (numbers added; internal brackets omitted).

If the claimant has a severe impairment, at step three, the ALJ will determine the medical severity of the impairment. 20 C.F.R. § 416.920(a)(4)(iii). If the impairment meets or equals one of the impairments listed in the regulations ("the listings"), then "the claimant is presumptively disabled without regard to age, education, and work experience." *Tate v. Apfel*, 167 F.3d 1191, 1196 (8th Cir. 1999) (quotation omitted).

If the claimant's impairment is severe, but it does not meet or equal an impairment in the listings, at step four, the ALJ will assess the claimant's residual functional capacity ("RFC") and the demands of the claimant's past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). RFC is what the claimant can still do despite his or her limitations. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing 20 C.F.R. §§ 404.1545(a), 416.945(a)). RFC is based on all relevant evidence and the claimant is

4

responsible for providing the evidence the Commissioner will use to determine the RFC. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). "Past relevant work" is any work the claimant performed within the fifteen years prior to his application that was substantial gainful activity and lasted long enough for the claimant to learn how to do it. 20 C.F.R. § 416.960(b)(1). If a claimant retains enough RFC to perform past relevant work, then the claimant is not disabled. *Id*. § 416.920(a)(4)(iv).

At step five, if the claimant's RFC will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to show there is other work the claimant can do, given the claimant's RFC, age, education, and work experience. *Id*. §§ 416.920(a)(4)(v), 416.960(c)(2). The ALJ must show not only that the claimant's RFC will allow the claimant to do other work, but also that other work exists in significant numbers in the national economy. *Eichelberger*, 390 F.3d at 591 (citation omitted).

## A.    *The ALJ's Findings*

The ALJ made the following findings at each step of the five-step process regarding Claimant's disability status.

At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since the alleged onset date of January 16, 2015. (AR at 29.)

At step two, the ALJ found that Claimant suffered from the following severe impairments: diabetes mellitus; obesity; and thoracic degenerative disc disease. (*Id.*)

At step three, the ALJ found that Claimant did not have an impairment or combination of impairments that met or equaled a presumptively disabling impairment listed in the regulations, either when considered singly or in combination. (*Id.*)

At step four, the ALJ found that Claimant had the following RFC:

[C]laimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c), except he may standing [sic] or walk up to six hours of an eight-hour workday and sit up to six hours of an eight-hour workday, while lifting or carrying 50 pounds occasionally and 25 pounds

frequently. In addition, he may frequently balance, stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, or scaffolds. Finally, the claimant must avoid unprotected heights and moving mechanical parts.

(*Id.* at 30.)  The ALJ further found Claimant was able to perform his past relevant work as a sales clerk and as a tractor-trailer truck driver.  (*Id.* at 33.)  Although the ALJ found Claimant capable of performing his past relevant work, he moved on to step five to make alternative findings.  (*Id.* at 34.)

At step five, the ALJ found that Claimant was 58-years-old when he first applied for benefits, which made him an individual of advanced age on his alleged onset of disability date.  (*Id.*)  During the pendency of his case, Claimant subsequently changed age categories and moved into the "closely approaching retirement age" category.  (*Id.*)  The ALJ found there were other jobs that existed in significant numbers in the national economy that Claimant could also perform, including hand packager, cleaner II, and automobile detailer.  (*Id.* at 34-35.)  Therefore, the ALJ concluded that Claimant was not disabled.  (*Id.* at 35.)

**B.**    ***The Substantial Evidence Standard***

The ALJ's decision must be affirmed "if it is supported by substantial evidence on the record as a whole."  *Moore*, 572 F.3d at 522.  "The phrase 'substantial evidence' is a 'term of art' used throughout administrative law. . . . [T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations and quotations omitted). The court cannot disturb an ALJ's decision unless it falls outside this available "zone of choice" within which the ALJ can decide the case.  *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (citation omitted).  The decision is not outside that zone of choice simply because the court might have reached a different decision.  *Id.* (citing *Holley v.*

6

*Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001)); *Moore*, 572 F.3d at 522 (holding that the court cannot reverse an ALJ's decision merely because substantial evidence would have supported an opposite decision).

In determining whether the Commissioner's decision meets this standard, the court considers all the evidence in the record, but does not reweigh the evidence. *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). A court considers both evidence that supports the ALJ's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [ALJ's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

## III.    DISCUSSION

Claimant alleges the ALJ committed reversible error by (A) not fully and fairly developing the record related to Claimant's limitations and by not considering treatment records from his podiatrist and (B) not properly evaluating Claimant's subjective complaints of pain. Claimant further argues the ALJ was not appointed in a constitutional manner, thus the ALJ's decision must be vacated and Claimant's claim remanded so a properly-appointed ALJ may adjudicate the claim.

### A.    *The ALJ did not fully and fairly develop the record in this case.*

The "social security hearing is a non-adversarial hearing, and the ALJ has a duty to fully develop the record." *Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)). The ALJ bears this responsibility "independent of the claimant's burden to press his case" and extends to cases where claimants are represented by counsel at the administrative hearing. *Stormo*, 377 F.3d at 806.

7

Claimant argues the ALJ failed to fully and fairly develop the record by not obtaining a treating or examining opinion regarding Claimant's neuropathy, his main complaint and the reason he stopped working. (Doc. 11 at 3.) Claimant also asserts the ALJ erred by failing to develop the record regarding treatment notes from his podiatrist. (*Id.* at 9.)

1. ***Whether the ALJ Failed to Fully and Fairly Develop the Record Regarding Claimant's Neuropathy***

    a. ***The Parties' Arguments***

The first impairment Claimant listed on his application for DIB was neuropathy. (AR at 205.) Neuropathy is "a classic term for any disorder affecting any segment of the nervous system." *Stedman's Medical Dictionary* 1313 (28th ed. 2006). In many treatment notes, doctors use the term "polyneuropathy." Polyneuropathy is

> [a] nontraumatic generalized disorder of peripheral nerves, affecting the distal fibers with most severity, with proximal shading (e.g., the feet are affected sooner or more severely than the hands), and typically symmetrically; most often affects motor and sensory fibers almost equally, but can involve either one, either solely or very disproportionately . . . .

*Id.* at 1536. Claimant argues that in this case, where the ALJ made his decision without the benefit of a treating or examining physician opinion regarding Claimant's "limitations or the reasonableness of his subjective complaints given the medical record," the ALJ should have ordered a consultative examination or sought clarification from Claimant's physician. (*Id.* at 5.)

Claimant further argues that the ALJ rejected Claimant's subjective complaints of neuropathy and crafted an inappropriate RFC, a task that requires the ALJ to "consider at least some supporting medical evidence." (*Id.* at 4.) In so doing, Claimant avers that the ALJ was playing doctor because he was drawing on his own inferences from the medical records "to craft a decision and deny benefits." (*Id.* at 5.)

8

Claimant relies on *Combs v. Berryhill*, 878 F.3d 642 (8th Cir. 2017) in arguing that the Court must remand Claimant's case because the ALJ played doctor. (*Id.*) In *Combs*, the court held that the ALJ did not fulfill his duty to fully and fairly develop the record because the ALJ relied "on his own inferences as to the relevance of the notations 'no acute distress' and 'normal movement in all extremities' [in treatment notes] when determining the relative weight to assign" state agency physicians' opinions. 878 F.3d at 647. On appeal, the Commissioner conceded that "no acute distress" was "of no particular significance with a chronic condition" such as the claimant's. *Id.* The record in the case contained no opinion from a treating or examining physician and the two agency physicians who reviewed the record came to different conclusions regarding the claimant's RFC. *Id.* at 646. The ALJ chose to credit the least-restrictive of the two opinions. *Id.* The court remanded the case so the ALJ could "conduct further inquiry as to what relevance Combs' being in 'no acute distress' and having 'normal movement of all extremities' [had] for her ability to function in the workplace." *Id.* at 647.

The Commissioner responds that the ALJ fully developed the record and that the record contained "sufficient evidence for the ALJ to make an informed decision" because the ALJ considered not only the state agency opinions, but also medical treatment notes, imaging results, and Claimant's activities and abilities. (Doc. 12 at 7-8.) The Commissioner notes that *Nevland v. Apfel*, 204 F.3d 853 (8th Cir. 2000), cited by Claimant, only requires remand when the record contains no medical evidence supporting the ALJ's decision, which is not the situation with the case at bar. (*Id.* at 8-9) (gathering cases where ALJ relied on medical records, "some medical evidence," and stating that no specific medical opinion is required to support an ALJ decision).

The Commissioner also argues that *Combs* can be distinguished from the case at bar because in *Combs*, notations of "no acute distress" were not relevant to the claimant's ability to function in the workplace. However, in this case, "the ALJ relied on findings

9

that go directly to [Claimant's] ability to perform the reduced range of medium work" assigned by the ALJ. (*Id.* at 14.)

### b. Analysis

The Eighth Circuit has held:

> Ultimately, the claimant bears the burden of proving disability and providing medical evidence as to the existence and severity of an impairment. Past this point, "an ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." *Naber v. Shalala*, 22 F.3d 186, 189 (8th Cir. 1994).

*Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013) (internal citations omitted). The ALJ must determine a claimant's RFC "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his] limitations." *Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)).

"Because [a] claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citation omitted). "However, there is no requirement that an RFC finding be supported by a specific medical opinion." *Id.* (citing *Meyers*, 721 F.3d at 526-27) (affirming RFC without medical opinion evidence); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012) (same)). Although Claimant bears the burden to "provid[e] the evidence [the Court] will use to make a finding about [Claimant's] residual functional capacity," the Court is "responsible for developing the claimant's complete medical history." 20 C.F.R. § 404.1545(a)(3) (2019). "The ALJ's obligation to develop the record 'is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence.'" *Coleman v. Colvin*, No. 13cv1004 EJM, 2013 WL

4069523, at *2 (N.D. Iowa Aug. 12, 2013) (quoting *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001)). "The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole." *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)); *Martin v. Berryhill*, No. 1:18-CV-00004 JM/PSH, 2019 WL 138655, at *6 (E.D. Ark. Jan. 8, 2019) (explaining that "the ALJ must weigh the various medical opinions in the record") (citation omitted), *R. & R. adopted*, 2019 WL 334202 (E.D. Ark. Jan. 25, 2019). "No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment." SSR 96-4p.

In this case, the only medical opinions were from the state agency reviewing physicians. (AR at 72-88.) Melodee Woodward, M.D., reviewed the record on September 16, 2015 and found Claimant only partially credible. (*Id.* at 77.) Dr. Woodward found that Claimant's claims of disabling neuropathy were not supported by his medical records and concluded that his neuropathy did not significantly limit his ability to do basic work activities. (*Id.* at 75-77.) On reconsideration, Jan Hunter, D.O., reviewed the record, including medical records that had been added to the record after Dr. Woodward's initial review, and affirmed Dr. Woodward's assessment as written. (*Id.* at 86.)

The ALJ gave these opinions little weight because after the opinions were written, "sufficient evidence [was added to the record] that [C]laimant's neuropathy and thoracic degeneration *likely* have more than a minimal impact on his functioning." (*Id.* at 33 (emphasis added).) To support his decision, the ALJ relied, in relevant part, on the following evidence: [A]lthough the claimant complains of numbness and tingling in his

11

extremities secondary to neuropathy . . . , the submitted records contain no electrodiagnostic study results, such as an electromyography (EMG), to show the extent of the neuropathic disease process. Moreover, x-ray imaging, while confirming thoracic spine degeneration, showed no evidence of acute fracture or subluxation." (*Id.* at 31.) The ALJ also concluded that treatment notes from Claimant's physicians did not support a finding of disability. For example, on October 4, 2016, Claimant saw Dr. Shah because he had been having balance problems at night for the previous six months. (*Id.* at 408 (noted at *id.* at 32).) Claimant stated that he had no problems during the day, not even walking in his uneven yard. (*Id.*) Dr. Shah diagnosed the problem as related to Claimant's neuropathy and ordered an MRI to help diagnose the source of headaches Claimant also discussed at the same appointment. (*Id.* at 412.) The ALJ also noted that Claimant's gait has consistently been normal during his medical appointments. (*Id.* at 32 (citing AR 286, 291, 295, 300, 411, 412, 417, 421).) The ALJ further stated "on the one occasion a treating source measured strength and muscle tone . . . , he characterized them as normal." (*Id.*) The ALJ opined, "These observations suggest the claimant retains the ability to remain on his feet throughout a workday, even if he experiences slightly diminished sensation." (*Id.*)

The ALJ also relied on evidence of Claimant's daily activities to support his conclusion.

> According to his function report, the claimant has no problem with personal care tasks, like dressing, bathing, shaving, or toileting. He also prepares meals daily, does laundry, mows his yard, and shops in stores. These tasks suggest the claimant can tolerate the lifting, carrying, pushing, pulling, standing, walking, and sitting required by work at the medium level of exertion-especially when also considering the previously described physical exam results and absence of electrodiagnostic evidence.

(*Id.*)

12

I find that the ALJ's decision on this issue is not supported by substantial evidence in the record as a whole. The ALJ arguably gives a more favorable to Claimant than the state agency physicians by stating that evidence added to the record after the opinions were written would *likely* indicate that Claimant's neuropathy would have more than a minimal impact on his functioning. However, the ALJ admits that there is no physician's opinion in the record regarding the impact of the later-included medical records. This case is very similar to *Nevland* in which "not one of [the claimant's] doctors was asked to comment on [the claimant's] ability to function in the workplace" and thus there was "no *medical* evidence about how [the claimant's] impairments affect his ability to function now." 204 F.3d at 858 (emphasis in original). In this case, as in *Nevland*, the only opinions in the record related to the claimant's RFC are from the state agency reviewing physicians. *See id.* at 856. None of the treatment notes in the record say anything about Claimant's ability to work or to function in the workplace.

This case is also analogous *Combs* because the ALJ "rel[ied] on his own inferences as to the relevance [of later-added treatment notes] when deciding the relative weight to assign to" the state agency physicians' opinions. *See Combs*, 878 F.3d at 647. The Commissioner is correct that the Commissioner conceded that that information at issue in *Combs* was irrelevant to the final decision, but has not so conceded in this case. In some respects, this makes remand more necessary, not less. The ALJ must rely on medical evidence relating to Claimant's current ability to do work-related activities. There are no treatment notes or physician opinions in the record relating to Claimant's current ability to do work-related-activities and only the ALJ's speculation as to what effect his impairments have on his RFC.

The treatment notes relied on by the ALJ have no relationship to Claimant's RFC, specifically the part of Claimant's RFC that requires him to stand or walk up to six hours in an eight-hour work day and/or sit up to six hours in an eight-hour work day. Claimant

13

consistently told his doctors and the Social Security Administration ("SSA") that he has numbness, tingling, and pain in his legs and feet. (AR at 44-45, 215-17, 219-24, 315, 322, 328-29, 331, 411, 426, 432, 473-74, 477.) That is the reason he quit being a commercial truck driver, a job he loved and that he and his wife shared when she was on vacation from her job. (*Id.* at 55-56.) Claimant testified that he "couldn't feel the pedals anymore . . . [and] had a couple bad accidents, and just—before I killed somebody, I had to get out of the truck." (*Id.* at 48.) In addition, Claimant testified he is unable to continue driving as a commercial truck driver not only because of his neuropathy, but also because he let his commercial driver's license lapse due to fears over causing another accident. (*Id.*) Claimant worked in a hardware store for less than a year after he stopped driving a commercial truck, but quit that job because his "feet and legs hurt so bad. . . . [when he] was on the floor for sometimes six hours straight." (*Id.*) That Claimant has a normal gait during a short doctor appointment does not necessarily translate into the ability to stand six hours out of an eight-hour work day. As noted above, polyneuropathy, which is Claimant's diagnosis, does not always affect a person's motor and sensory fibers equally or even at all. *See Stedman's*, *supra*, at 1536. Thus, the ALJ's reliance on a physician's strength test is also misplaced. Neuropathy does not necessarily affect strength. Thus, Claimant's strength rating has nothing to do with his ability to "remain on his feet throughout a workday, even if he experiences slightly diminished sensation," at least not without a medical source connecting the two seemingly-unrelated issues.

Importantly, in the treatment note cited by the ALJ regarding Claimant's strength, Claimant's sensory exam yielded the following results:

Right leg vibration: decreased from ankle
Left leg vibration:   decreased from ankle
Right leg pinprick:  decreased from lower 1/3 of leg
Left leg pinprick:   decreased from lower 1/3 of leg

14

(*Id.* at 411.)  This test corroborates Claimant's claims of decreased sensation in his lower legs and feet and is consistent with Claimant's testimony at the hearing.  (*Id.* at 49.)  *See also* (*id.* at 417, 421 (sensory exams noting decreased sensation to light touch and vibration from ankle on both sides); 426, 431 (paresthesia and decreased sensation in feet and hands bilaterally);[3] 471 (neuropathy screening: monofilament test, vibratory sensation test, sharp/dull distinction test, and proprioception test results all abnormal).) The ALJ dismisses these sensation tests by focusing on the lack of an EMG.  (*Id.* at 31 ("While the record does contain physical examination results showing decreased lower extremity sensation, the absence of laboratory test results showing compromised nerve signals or spinal nerve compressions draws [Claimant's] claims of symptom severity into doubt.").) The ALJ makes much of the absence of an EMG test in the record, but the sensory examinations conducted by Claimant's physicians are acceptable tests to diagnose neuropathy.  *See* Columbia Department   of Neurology, *Diabetic Neuropathy*, http://www. columbianeurology.org/neurology/staywell/document.php?id =33543, ("In addition to a complete medical history and physical examination, the doctor *may* Check muscle strength; Check muscle reflexes; Check muscle sensitivity to the following: Position, Vibration, Temperature, [and] Light touch; Request additional tests, such as . . . Electromyography . . .") (bullet points omitted; punctuation and emphasis added).

The ALJ's reliance on Claimant's daily activities also does not support the RFC. Claimant's ability to "cook bacon and eggs or something in a Crockpot or air fryer" and to take care of his daily hygiene needs in a home with a handicapped-equipped bathroom does not equate to being able to be on his feet up to six hours a day or to sit in a work setting up to six hours a day.  (AR at 46, 56.)  The ALJ also stated that Claimant "does

---

[3] Paresthesia is "[a] spontaneous abnormal usually nonpainful sensation (e.g., burning, pricking); it may be due to lesions of both the central and peripheral nervous systems." *Stedman's Medical Dictionary* 1425 (28th ed. 2006).

15

laundry, mows his yard, and shops in stores." (*Id.* at 32.)  However, Claimant mowed the yard on a riding mower and then only for 45 minutes at a time before he had to take off his shoes and socks and rest his feet and shopped for twenty minutes at time. (*Id.* at 219, 222.)[4]  Claimant also said that he had changed his cooking habits because he can no longer stand and watch food cook constantly.  (*Id.* at 221.)  Claimant has consistently stated that he needs elevate his feet to keep them from hurting after being on them for 20 to 30 minutes and that even sitting with his feet on the floor is painful; he spends most of his day in a recliner with his feet elevated or sleeping in bed.  (*Id.* at 51-53; 219-23.)  The Eighth Circuit has repeatedly held that a claimant's ability to perform household chores does not necessarily mean the claimant can perform gainful work activity outside the home.  *See Ford v. Astrue*, 518 F.3d 979, 983 (8th Cir. 2008) (holding that daily activities of "washing a few dishes, ironing one or two pieces of clothing, making three or four meals each week, and reading" were not inconsistent with claimant's claim of pain or with an inability to hold a fulltime job); *Leckenby v. Astrue*, 487 F.3d 626, 634 (8th Cir. 2007) (holding that claimant's ability to fold laundry, shop once a week, watch her children at independent play, drive short distances about three times a month, and watch television and listen to music before dozing off or losing concentration did not mean she had the ability to work fulltime).  "[I]t is well-settled law that a claimant need not prove she [or he] is bedridden or completely helpless to be found disabled."  *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005) (citations and internal quotation marks omitted).

---

[4] Claimant provided this information in his Adult Function Report on July 30, 2015.  (AR at 219.)  At the hearing on August 9, 2017, Claimant said he and his wife had moved into a "62 and older" apartment.  (*Id.* at 49.)  It is therefore questionable whether Claimant mows the lawn anymore.

The Commissioner argues that Claimant's physician's admonitions to control his chronic conditions with diet and lifestyle changes, including exercise, "can suggest lack of functional restrictions on the claimant's activities." (Doc. 12 at 11 (citing *Moore*, 572 F.3d at 524; AR 329).) While that might be true, there is no indication as to what types of exercise Dr. Pasarin recommended when she and Claimant met on October 26, 2015, so this treatment note has no context from which to determine the type of exercise Dr. Pasarin expected Claimant to do. She did list peripheral polyneuropathy in Claimant's medical history. (*Id.* at 327.) Two weeks after this appointment, Claimant saw Dr. Dalil because he rated his neuropathy pain an 8/10. (*Id.* at 332.) Gabapentin and Amiptyline were not working well for Claimant. (*Id.*) Dr. Dalil switched Claimant to Lyrica. (*Id.*) Claimant says the Lyrica works much better, but still only cuts his pain by about one-third. (*Id.* at 47.)

The ALJ seems to have speculated regarding the impact that Claimant's later-added records would have on his ability to work and did not rely not on any medical opinion that addressed later-added evidence or on any treatment notes that addressed Claimant's ability to work or engage in activities that closely resembled work. Thus, Claimant's RFC was based on a record that was not fully developed. The case should be remanded so the ALJ can obtain the opinion of a treating or examining physician regarding the Claimant's work-related abilities and an EMG, if the ALJ determines that is necessary to fully develop the record. In addition, because the treatment notes and daily activities the ALJ relied on do not support his decision, the RFC was not supported by substantial evidence in the record as a whole. I recommend the Court reverse the ALJ's decision on this issue and remand the case to obtain the opinion of a treating or examining physician regarding Claimant's ability to work and, if necessary, an EMG test.

### 2. Whether the Record was not Fully Developed Because it did not Contain Evidence Claimant Later Submitted to the Court

Claimant argues that the case must be remanded for the ALJ to consider records from Cedar Valley Podiatry, evidence he did not submit initially or on appeal to the Appeals Council.[5] Claimant cites no authority for his entitlement to a remand under these circumstances, instead stating that the Commissioner is responsible for this oversight because he told the SSA about his podiatrist at Cedar Valley Podiatry. (Doc. 11 at 10.)

When deciding if a case should be remanded because certain medical records were not obtained, the proper "inquiry is whether [Claimant] was prejudiced or treated unfairly by how the ALJ did or did not develop the record; absent unfairness or prejudice, [the Court] will not remand." *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993) (citing *Phelan v. Bowen*, 846 F.2d 478, 481 (8th Cir. 1988)). In this case, I find that Claimant was not prejudiced by the failure to obtain records. Claimant did not inform the SSA about the existence of a podiatrist until he filed a "recent medical treatment form," apparently on July 12, 2017. (AR at 190[-1] (Table of Contents to Section), 266.) Even though this was less than a month before the hearing in his case, when the ALJ asked Claimant's counsel, Mr. Field, if he had any objections to the exhibits in the record, Mr. Field said, "I do not, and I am not aware of any outstanding records." (*Id.* at 42.)

The *Onstad* court noted, "[w]hile the ALJ has a duty to develop the record fully and fairly, even when a claimant has a lawyer, it is of some relevance to us that the lawyer did not obtain (or, so far as we know, try to obtain) the items that are now being complained about." 999 F.2d at 1234 (internal citation omitted); *see also Offield v. Barnhart*, No. C04-3076-MWB, 2006 WL 533783, at *18 (N.D. Iowa Mar. 2, 2006) (same). The same can be said in this case. At the point that Mr. Field volunteered that

---

[5] Claimant makes no argument related to the evidence first submitted to the Appeals Council.

there were no outstanding records, SSA was absolved of any obligation to obtain more medical records. Claimant's citation to a treatment note stating that Claimant was seen for a "foot exam so he can get new diabetic shoes from Dr. [C]ibula" is unhelpful. (Doc. 11 at 9 (citing AR at 470).) At most, this note put the ALJ on notice that Dr. Cibula provided Claimant with special shoes, not that he had medical records related to Claimant's neuropathy. Claimant's diabetes is being successfully treated with medication and with lifestyle and diet changes, and is therefore is not a disabling condition. (AR at 477 (May 8, 2017 treatment note).) Claimant does not even proffer diabetes as a disabling condition before the Court, relying on neuropathy without identifying a cause. After Claimant's attorney said the record was complete, the ALJ had no reason to suspect there was anything relevant in Dr. Cibula's treatment notes.

Moreover, I find that failure to include Dr. Cibula's treatment notes from Cedar Valley Podiatry did not prejudice Claimant. Claimant seems to concede that he did not see Dr. Cibula for neuropathy because he argues, "Generally, these records show issues with [Claimant's] feet impacting his ability to stand and walk during the relevant period." (Doc. 11 at 10.) Claimant saw Dr. Cibula for ongoing footcare related to long and painful toenails that hurt when pressure was applied or when Claimant wore "shoe gear." (Pl. Ex. 1.) Claimant saw Dr. Cibula five times prior the hearing and each time he complained of "long, painful toenails," which sometimes made ambulating difficult. (*Id.* at 16, 19, 21, 23, 25, 26-27.) Dr. Cibula found Claimant's symptoms consistent with onychomycosis (*Id.*), a "very common fungus infection of the nails. . . ." *Stedman's*, *supra*, at 1367. In addition, at every appointment, it seems that Claimant's condition was successfully treated with "sharp debridement of [his] nails." (Pl. Ex. 1 at 16, 19, 21, 23, 25, 27.) Claimant was reminded that failure to follow treatment guidelines and to debride his nails at necessary intervals could cause *recurrence* of pain. (*Id.* at 16, 19, 21, 23, 25, 27 (emphasis added).) This indicates that the treatments Claimant received

19

at his as-recommended nine-to-ten-week treatment appointments with Dr. Cibula were successful. *See, e.g.* (*id.* at 25 (recommending follow up in 9-10 weeks).) An impairment that is controlled with treatment or medication is not considered disabling. *Brace v. Astrue*, 578 F.3d. 882, 885 (8th Cir. 2009) (citations omitted). At every appointment, Dr. Cibula had to explain to Claimant "the importance of keeping the mycotic infection well under control. We discussed treatment options including topical antifungal medication, oral antifungal medication, or permanent removal of the more severely affected nails." (*Id.* at 16, 19, 21, 23, 25, 27.) To the extent Claimant did not follow Dr. Cibula's orders and keep the infection under control, that failure would undermine any claim based on long painful toenails and onychomycosis. *See Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004) ("failure to follow prescribed medical treatment without good cause is a basis for denying benefits") (citing *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995)).

On one occasion, Claimant complained about his neuropathy and asked for "better shoe gear to ambulate and 'feel better than my other shoes.'" (*Id.* at 21.) In his treatment notes from this appointment, Dr. Cibula noted that Claimant's toes have the greatest symptoms of paresthesia and numbness. (*Id.*) In spite of this one reference, I do not find that omission of these records prejudices Claimant. As discussed above, the record before the ALJ documented Claimant's neuropathy and foot numbness, pain, and tingling. Thus, this one treatment note regarding the part of the foot most affected by neuropathy is not dispositive of anything. When he applied for benefits, Claimant stated neuropathy was the cause of his walking and standing problems. (*Id.* at 215-17.) Claimant continued to claim this at his hearing. (*Id.* at 44-59.) At the hearing, Claimant's counsel focused on neuropathy in his opening statement and asked Claimant how his neuropathy affected him, not how his toenail pain affected him. (*Id.* at 42, 47.) Thus, I find that Claimant was not only not prejudiced by the failure to include this information

in the record, but also that remand to include this information is not necessary to fully develop the record.

**B.     *The ALJ did not properly evaluate Claimant's Subjective Complaints.***

Claimant argues that the ALJ did not properly evaluate Claimant's subjective complaints. Much of the preceding discussion is relevant to this issue because Claimant's claims of numbness, tingling, and pain caused by his neuropathy are subjective complaints.

When a claimant suffers from a severe impairment, but the impairment does not meet or equal a disabling impairment listed in the regulations, the ALJ "will consider the impact of [the claimant's] impairment(s) and any related symptoms, including pain, on [the claimant's] residual functional capacity." 20 C.F.R. § 404.1529(d)(4). This determination involves a two-step process in which the ALJ first decides whether the claimant has a medically determinable impairment that could reasonably be expected to produce the claimant's symptoms and then evaluates the intensity and persistence of the claimant's symptoms. *Id.* § 404.1529(b),(c). When evaluating the claimant's subjective complaints during the second step, the ALJ considers the objective medical evidence, the claimant's work history, and evidence relating to the following factors ("the *Polaski* factors"): (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) [the claimant's] functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. § 404.1529(c)(3).[6] An ALJ is not required to methodically discuss each *Polaski* factor as long as the ALJ "acknowledge[es]

_____

[6] The Code of Federal Regulations includes the additional factors of: (1) other treatment the claimant receives for pain relief; and (2) measures the claimant uses to relieve pain "(e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.)." 20 C.F.R. § 404.1529(c)(3)(v), (vi).

and examin[es] those considerations before discounting [a claimant's] subjective complaints." *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (*citing Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)).

After considering the factors and evidence, the ALJ determines the extent to which the claimant's symptoms affect the claimant's capacity to perform basic work activities. *Id.* § 404.1529(c)(4). The claimant's "symptoms, including pain, will be determined to diminish [the claimant's] capacity for basic work activities to the extent that [the claimant's] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.*

In this case, the ALJ found that Claimant had medically determinable impairments that could reasonably be expected to cause his alleged symptoms. (AR at 29.) The ALJ also found that "[d]espite the claimant's allegations, . . . the claimant likely retains the ability to perform work as described in the above-listed residual functional capacity assessment. Specifically, the relatively minor findings seen in spinal radiographs, the absence of electrodiagnostic test results confirming his neuropathy, his statements to medical sources, physical examination results, and his daily activities show the claimant could likely perform medium work." (*Id.* at 31.)

Claimant is correct that his "consistent earnings history—not discussed by the ALJ—tends to support [Claimant's] allegations that the severity of his neuropathy symptoms was preventing him from working." *See Milam v. Colvin*, 794 F.3d 978, 985 (8th Cir. 2015) (quoting *Black v. Apfel*, 143 F.3d 383, 387 (8th Cir. 1998)). However, failure to mention work history is not reversible error if the ALJ's credibility determination is otherwise supported. *Roberson v. Astrue*, 481 F.3d 1020, 1025-26 (8th Cir. 2007) (declining to reverse the decision based on ALJ's failure to discuss claimant's work history and reasoning that while "[i]t might have been better if the ALJ had referred

specifically to Ms. Roberson's work record when determining her credibility . . . . [,] we do not think that the ALJ was required to refer to every part of the record, and we think that the portions of the record that he referred to were sufficient to support his credibility determination.").

As discussed above, I have already found that the ALJ improperly relied on Claimant's daily activities to support his decision.  I agree with Claimant that the ability to get dressed and use the toilet independently is not evidence of "an ability to perform medium [level work] or stand on one's feet throughout the day."  (Doc. 11 at 7.) Claimant quit driving a truck because of his neuropathy and then quit working at the hardware store because being on his feet up to six-hours-a-day, the standing and walking requirement the ALJ included in Claimant's RFC, caused him pain.  There is nothing in his daily activities that suggests anything other than intermittent standing, walking, or sitting with his feet on the ground followed by long periods where Claimant sits with his feet elevated or where he lies down.  (*See* AR at 49-53, 215-24.)  Even though Claimant is capable of shopping for 20 minutes at a time and mowed his lawn with a riding lawn mower in 45-minute intervals before needing a rest, and can still drive a car sometimes on short trips, the ability to perform certain activities occasionally is not inconsistent with a disability finding.  *See Ross v. Apfel*, 218 F.3d 844, 849 (8th Cir. 2000) (The claimant's ability to mow the lawn, help paint a cabin, drive, watch television, and sit in a fishing boat on his "good days" was not inconsistent with his testimony that on his bad days he could not function at all because "[t]he ability to perform sporadic light activities does not mean that the claimant is able to perform full time competitive work.").  Here, Claimant testified that when he goes to the store, he "pays for it all day," and that the longest he can sit with his feet on the ground in front of the computer or something like that is an hour before his calves and toes start to ache.  (AR at 49, 53.)  I find that the ALJ did not properly evaluate Claimant's daily activities.

I have also already discussed the ALJ's evaluation of the objective medical evidence in the record and the ALJ's seeming-instance that the record contain an EMG in order to corroborated Claimant's diagnosis and claims. An EMG is not a required test to diagnose neuropathy. None of Claimant's physicians have ever questioned Claimant's credibility or honesty. That the treatment notes in the record are not very thorough and do not describe in-depth the symptoms Claimant experiences (i.e., increased neuropathy after walking a certain distance or standing a certain amount of time) is not something that was under Claimant's control. What the record does document is years of treatment for neuropathy and failed treatment with Gabapentin because Claimant experienced such balance issues that he fell out of bed and off the couch and injured himself and had balance issues in the dark. (*Id.* at 411, 443.) The pages the Commissioner cites from the record are all treatment notes where Claimant was being seen for issues other than neuropathy. In-depth notes related to Claimant's neuropathy would not be included there. The Commissioner argues that the cited pages document conservative treatments and normal gait, which are inconsistent with a finding of disability. (Doc. 12 at 21.) However, the appointments associated with the treatment notes cited by the Commissioner all state that Claimant experiences numbness, pain, paresthesia, and loss of sensation on neurological examinations. (AR at 411, 420-21, 426, 433, 459, 474, 477-78.) The change from Gabapentin to Lyrica helped Claimant, but he still rated his pain at 7/10 on May 8, 2017 (*Id.* at 477) and testified that the Lyrica only cut his pain by one-third. (*Id.* at 47.) Again the Commissioner's reliance on Claimant's normal gait during short physician visits seems misplaced. Claimant does not claim that he is never able to walk with a normal gait. He claims that being on his feet or even having his feet on the floor rather than being elevated when he sits for more than a limited amount of time causes symptoms of his neuropathy that require him to elevate his feet or to lie down. And, as discussed above, the ALJ seems not to not have considered how polyneuropathy affects people in

24

different ways. In addition, the Commissioner calls Claimant's course of neuropathy treatment "conservative," but does not state what other treatments Claimant could have or should have considered besides medication or other treatments ordered by his physicians and home-experimentation. (*Id.* at 52, 57.) Therefore, I find that the ALJ did not properly evaluate the objective medical evidence in the record.

I find that while the ALJ did not do an in-depth analysis of the other *Polaski* factors, his decision indicates that he at least considered the other factors when evaluating Claimant's case. I therefore find no error in the ALJ's evaluation of any other *Polaski* factor.[7]

Accordingly, I recommend the District Court reverse the ALJ's decision on this issue and remand the case for the ALJ to consider how Claimant's activities of daily living and the objective medical evidence affect the ALJ's decision regarding Claimant's subjective complaints. This evaluation will be especially important if the Court adopts my recommendation to have the ALJ obtain a treating or examining opinion because that may add more objective medical evidence to the record.

### C. Claimant failed to timely raise his Appointments Clause argument under Lucia v. SEC.

In *Lucia v. SEC*, the Supreme Court held that ALJs of the Securities and Exchange Commission are "Officers of the United States" within the meaning of the Appointments Clause, and, therefore, the President, a court of law, or department head must appoint them. 138 S. Ct. at 2049. Claimant argues that SSA ALJs should be treated as improperly appointed "inferior officers" like the SEC ALJs in *Lucia*. (Doc. 11 at 10-24.) Claimant asserts this Court should vacate the denial of benefits by ALJ Hamilton

---

[7] Although Claimant's brief is confusing regarding what arguments he proffers related to credibility and what arguments he proffers related to development of the record, he does not seem to proffer arguments regarding other *Polaski* factors.

and remand the case for decision by what he contends is a properly-appointed ALJ. (*Id.* at 10.) Claimant admits he is asserting this Appointments Clause challenge for the first time in his brief to this Court. (*Id.* at 12, 15.)

Claimant does not argue that his case presents any factual or procedural differences from other cases that have previously been addressed by this Court. Indeed, this case has the same procedural posture as several other cases wherein this Court already addressed this issue (i.e., all administrative proceedings, including denial by the Appeals Council were completed before *Lucia* was decided on June 21, 2018). (AR at 2.) Rather, Claimant asserts that his case can be distinguished because many of the cases decided in this District were decided before EM-18003 was issued by the SSA and before former Acting Commissioner Berryhill's authority lapsed, which "led the SSA to lack a Department Head that could provide a remedy for an Appointments Clause challenge." (Doc. 11 at 10.)

For support, Claimant cites SSR 19-1p, 2019 WL 1202036, Effect of the Decision in *Lucia v. Securities and Exchange Commission (SEC)* on Cases Pending at the Appeals Council. (Doc. 13 at 3.) However, SSR 19-1p is inapplicable to Claimant's case because the ruling only applies to challenges timely raised before the Appeals Council or previously raised at the ALJ level. 2019 WL 1202036, at *9583; *see also Murphy v. Comm'r of Soc. Sec.*, No. 18-CV-61-LRR, 2019 WL 2372896, at *7 (N.D. Iowa April 10, 2019) (addressing SSR 19-1p and holding that claimant waived *Lucia* issue when she raised it for the first time in the district court), *appeal docketed*, No. 19-2202 (8th Cir. June 12, 2019).

Claimant also cites *Bizarre v. Berryhill*, 364 F. Supp. 3d 418 (M.D. Pa. 2019) and encourages the Court to adopt that court's reasoning in this case.[8] (Doc. 11 at 10.)

---

[8] Claimant also cited the Report and Recommendation in *Fortin v. Comm'r of Social Security*,

The *Bizarre* case held that it did "not believe that [the claimant] was required to raise his [Appointments Clause challenge] before the ALJ or Appeals Council in the first instance or that failure to do so worked a forfeiture of that claim." *Id.* at 425. I respectfully disagree and decline to adopt the *Bizarre* court's holding. Instead, I agree with the holding in *Murphy*: "[T]he court respectfully disagrees with the *Bizarre* court's holding. This court believes that failure to raise an Appointments Clause challenge before the ALJ or Appeals Council at the agency level waives the issue on judicial review at the district court level." 2019 WL 2372896, at *7 (citing *NLRB v. RELCO Locomotives, Inc.*, 734 F.3d 764, 798 (8th Cir. 2013); *Anderson v. Barnhart*, 344 F.3d 809, 814) (8th Cir. 2003)).

This Court has ruled in favor of the Commissioner on similar claims on several occasions. *See Hall v. Saul*, No. 18-CV-2032-LTS-KEM, 2019 WL 5085427, at *16 (N.D. Iowa Oct. 10, 2019); *Gilbert v. Saul*, No. C18-2045-LTS, 2019 WL 4751552, at *20 (N.D. Iowa Sept. 30, 2019); *Squier v. Saul*, No. 18-CV-3026-LTS, 2019 WL 4696415, at *10 (N.D. Iowa Sept. 26, 2019); *Rollie v. Saul*, No. 18-CV-129-CJW-KEM, 2019 WL 4673220, at *10 (N.D. Iowa Sept. 25, 2019); *Dewbre v. Comm'r of Soc. Sec.*, No. 18-CV-4055-LRR, 2019 WL 4344288, at *6 (N.D. Iowa Sept. 12, 2019); *Sexton v. Saul*, No. C18-1024-LTS, 2019 WL 3845379, at *8 (N.D. Iowa Aug. 15, 2019); *Frazer v. Saul*, No. C18-2015-LTS, 2019 WL 3776996, at *4 (N.D. Iowa Aug. 12, 2019); *Murphy*, 2019 WL 2372896, at *7; *White v. Comm'r of Soc. Sec.*, No. C18-2005-LTS, 2019 WL 1239852, at *4 (N.D. Iowa Mar. 18, 2019); *Stearns v. Berryhill*, No. 17-CV-2031-LTS, 2018 WL 4380984, at *6 (N.D. Iowa Sept.14, 2018); *Davis v. Comm'r of*

---

No. 18-cv-10187, 2019 WL 421071 at **1-4 (E.D. Mich. Feb. 1, 2019), *R. & R. adopted in part and rejected in part by* 372 F. Supp. 3d 558, *appeal docketed*, No. 19-1581 (6th Cir. May 24, 2019). The part of the R. & R. that was rejected was the recommendation that the case be remanded for rehearing before a properly-appointed ALJ. 372 F. Supp. 3d at 568.

*Soc. Sec.*, No. 17-CV-80-LRR, 2018 WL 4300505, at *8-9 (N.D. Iowa Sept. 10, 2018); *Iwan v. Comm'r of Soc. Sec.*, No. 17-CV-97-LRR, 2018 WL 4295202, at *9 (N.D. Iowa Sept. 10, 2018); *Thurman v. Comm'r of Soc. Sec.*, No. 17-CV-35-LRR, 2018 WL 4300504, at *9 (N.D. Iowa Sept. 10, 2018).

In *Stearns*, this Court ruled as follows:

> The United States District Court for the Central District of California has considered *Lucia* in the Social Security context, holding that claimants have forfeited the Appointments Clause issue by failing to raise it during administrative proceedings. *See Trejo v. Berryhill*, Case. No. EDCV 17-0879-JPR, 2018 WL 3602380, at *3 n.3 (C.D. Cal. July 25, 2018). I find this holding to be consistent with [relevant precedent]. Stearns' argument that an issue need not be raised if the ALJ does not have authority to decide it does not hold water under *Lucia*. *Lucia* made it clear that, with regard to Appointments Clause challenges, only "one who makes a timely challenge" is entitled to relief. *Lucia*, 138 S. Ct. at 2055 (quoting *Ryder*, 515 U.S. at 182-83).
>
> In *Lucia*, the Supreme Court acknowledged the challenge was timely because it was made before the Commission. *Id.* In the context of Social Security disability proceedings, that means the claimant must raise the issue before the ALJ's decision becomes final. . . . *Lucia* makes it clear that this particular issue must be raised at the administrative level.
>
> Because Stearns did not raise an Appointments Clause issue before or during the ALJ's hearing, or at any time before the ALJ's decision became final, I find that she has forfeited the issue for consideration on judicial review. As such, her request for remand on this basis is denied.

2018 WL 4380984, at **5–6 (paragraph break added).

Finally, although Claimant argues that raising the issue during the administrative process would have been futile because Social Security EM-18003 prevented the ALJ from addressing the issue (Doc. 11 at 12), nothing stopped Claimant from raising the issue during the administrative process and preserving it for appeal. In addition, Claimant's argument that former Acting Commissioner Berryhill's authority lapsed

28

between November 2017 and April 2018, leaving "no Department Head at the Social Security Administration with the power to appoint an inferior officer to hear his claim or otherwise decide his claim during much of the time her [sic] claim was pending with the Appeals Council" (*Id.*) is unavailing for the same reason. Nothing prevented Claimant from raising this issue in his appeal to the Appeals Council and preserving it for appeal to this Court.

However, because I recommend that Claimant's request for remand should be granted on the basis of the failure to properly develop the record and by not properly evaluating Claimant's subjective complaints, Claimant should be permitted to assert this objection on remand. *See Weatherman v. Berryhill*, No. 5:18-CV-00045-MOC, 2018 WL 6492957, at \*4 (W.D.N.C. Dec. 10, 2018); *Mann v. Berryhill*, No. 4:18-CV-3022, 2018 WL 6421725, at \*8 (D. Neb. Dec. 6, 2018); *Clayton C. v. Comm'r of Soc. Sec.*, No. C18-638 BHS-BAT, 2018 WL 5985255, at \*4 (W.D. Wash. Oct. 16, 2018), *R. & R. adopted sub nom, Christianson v. Berryhill*, 2018 WL 5962899 (Nov. 14, 2018). Relying on *Mann*, this Court has noted, "[O]n remand, a claimant may challenge an ALJ's appointment because Appointments Clause challenges are deemed to be in the category of nonjurisdictional structural constitutional objections that could be considered on appeal whether or not they were ruled upon below." *Anderson v. Comm'r of Soc. Sec.*, No. 18-CV-24-LRR, 2019 WL 1212127, at \*5 (N.D. Iowa Feb. 19, 2019) (internal quotations omitted). If, however, the District Court declines to remand the case, this argument should be deemed waived.

## IV. CONCLUSION

For the foregoing reasons, I respectfully recommend that the District Court **affirm in part and reverse and remand in part the decision of the ALJ.**

- I recommend the Court **affirm the ALJ's decision** regarding development of the record related to treatment records of Claimant's podiatrist;

- I recommend the Court **reverse the ALJ's decision** to not obtain a treating or examining physician opinion regarding Claimant's impairments;
- I recommend the Court **reverse the ALJ's decision** regarding Claimant's subjective complaints; and
- I recommend the Court **remand the case**
  - to obtain a treating or examining physician opinion regarding Claimant's impairments and, if the ALJ deems it necessary, an EMG;
  - to have the ALJ conduct a proper evaluation of how the objective medical evidence and Claimant's daily activities affect his decision on Claimant's subjective complaints; and
  - if the Court is remanding for other reasons, to allow Claimant to assert his Appointments Clause challenge.

The parties must file objections to this Report and Recommendation within fourteen (14) days of the service of a copy of this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the District Court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** this 22nd day of January, 2020.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa